## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **05-CR-IOO (1)-RWR** |
| **ANTWUAN BALL** | |

### DEFENDANT BALL'S MEMORANDUM IN AID OF SENTENCING

Defendant Antwuan Ball, respectfully submits this Memorandum in Aid of Sentencing directed to the use of acquitted conduct in the calculation of his base offense level under the Sentencing Guidelines.

On November 28, 2007, a jury acquitted Antwuan Ball of all but one of the counts with which he was charged in the indictment.  Specifically, the jury found him guilty of Count 22, in which he was charged with the sale of 11 grams of cocaine base.  On the other hand, the jury acquitted Mr. Ball of the far more serious charges in the indictment:  Two homicides in which, but for the Court's ruling that the Government's notice was untimely, the Government would have been seeking the death penalty in the event of conviction; two conspiracies, one brought under the RICO Statute, in which the Government alleged that Mr. Ball had been the leader of a racketeering organization for 13 years and had committed numerous criminal offenses that were presented as acts of racketeering.

Yet, despite the jury's rejection of the months of testimony presented by the prosecution, the Government seeks to incarcerate Mr. Ball for the next 40 years, *i.e.* a period of time

equivalent (for all practical purposes) to the sentence he'd have received had the Government actually succeeded in convicting him of the serious offenses with which he was charged. Relying exclusively on the evidence that was adduced by the Government on direct examination of its witnesses, and ignoring both the jury's refusal to credit these witnesses as well as the witnesses presented by Mr. Ball, the Probation Office, applying a preponderance of the evidence standard, reached the unsurprising conclusion that there was sufficient evidence to include the acquitted conspiracies in its Guideline calculation and arrived at a 43, which provides for a sentence of 480 months. The enormity of the Government's arrogance in seeking such a sentence in the face of jury verdict that reflects its virtually total rejection of the Government's case against Mr. Ball can best be appreciated if one considers the following fact: the Government was willing to accept a sentence of no more than 25 years pursuant to a plea bargain that would have required Mr. Ball to admit crimes that he did not commit and of which he has now been acquitted.

The result the Government seeks is particularly offensive in this case because a fair examination of the evidence shows that  the Government sought to prove the most serious charges against Mr. Ball through a series of witnesses it knew or should have known were fabricating the accounts of events to which they testified.  Indeed, the with respect key witnesses on whose testimony the Government predicated the homicide and conspiracy charges against Mr. Ball, the blatant contradictions between the witness testimony and indisputable facts contained in the Government's own documents raises serious questions whether the Government disregarded its obligation to bring only those charges that it could prove beyond a reasonable doubt, believing that if it could provide any charges at all, it would nonetheless be able to use the unproven charges to reach a Guideline level indistinguishable from the one that would result from actually achieving convictions.

I.      **THE TROY LEWIS HOMICIDE**.

The Court will no doubt recall that 10 years before the Government decided to charge

Mr. Ball with this homicide, the Metropolitan Police Department had closed its investigation,

believing that Marlon "Truck" Washington had killed Mr. Lewis based upon information they

had obtained from two informants, both of whom, in the intervening decade, had passed away.

In opposing the defense request to inform the jury of that prior police decision, the Government

represented that the United States Attorney's Office had disagreed with the police decision to

close the case because of its assessment of the unreliability of one of the two informants on

whom the police relied.  Expressly noting that representation, the Court denied the defense

request.  In doing so, neither the Court nor the defense could have imagined that the Government

would present a witness whose testimony was proven indisputably to be false by nothing less

than the initial police report of the investigation and the autopsy of the decedent (not to mention

the calendar, which, had the Government bothered to think about it, demonstrated indisputably

that the witness was lying when he described the shooting of Mr. Lewis, which took place on

January 23 at 7:45PM, as having occurred "in the daytime," claiming to have heard the shots and

gone to the location of the shooting immediately thereafter.)

Yet, on May 8, 2007, Kairi Kelliebrew testified that he recalled the day that Troy Lewis

was shot and when the shooting occurred: "It was daytime."  Tr. at 10472.  In fact, Ball Exh. 96,

the initial police investigative report, reported that Mr. Lewis was killed on January 23, 1996, at

approximately 7:45 PM.  The police report also recorded the account of the first police officers

who arrived on the scene  They reported that Lewis was "laying on the street, face up, with his

hand laying toward the rear driver's side tire" and that a gun was lying on the ground.

Notwithstanding this police account – the admission of which was opposed by the Government

so that the contradiction of Kelliebrew would not disclosed – the Government adduced testimony

from Kelliebrew that he was present when the police arrived and that he observed "the police open the car door and his [Lewis's] brains fell out with his gun in his hand." *Id.* Kelliebrew did not testify to this only once.. To the contrary, the following day he confirmed that testimony at page 10662-10663, stating that he was "absolutely certain" that he "saw him [Lewis] slumping out, his brains coming out." Indeed, in his testimony on May 14, 2007, Kelliebrew confirmed that he had given this same account to the grand jury on November 22, 2005, specifically that he observed the police open the door and Lewis's brains fell out of his head. (Tr. at 10945).

With respect to Kelliebrew's observations of Mr. Lewis's brains, the Government's possession of Exhibit 1008, the autopsy of Mr. Lewis, ought to have caused them to pause before putting Kelliebrew on the witness stand to testify to this., since that document showed that Mr. Lewis did not receive any gunshot wounds to the head. But none of these variances between Kelliebrew's account and the incontrovertible facts made the Government hesitate to present his testimony as a truthful account of the events surrounding this homicide. Furthermore, the Government was not merely indifferent to whether Kelliebrew could have observed what he claimed; to the contrary, despite the number of times that Kelliebrew repeated his observations regarding Mr. Lewis's brains, the Government argued in its rebuttal closing argument that Mr. Kelliebrew had not testified to that point.

Mr. Kelliebrew also testified that Mr. Ball had confessed to his shooting Mr. Lewis in the presence of a number of other persons who were supposedly part of the Congress Park crew. Among the persons that Mr. Kelliebrew listed was Marlon "Truck" Washington. Mr. Kelliebrew recalled that this event occurred several weeks after Lewis's death (Tr. 10472), which was problematic in terms of Mr. Washington's presence because Washington had been killed by one of Mr. Lewis's closest friends three days after Lewis was killed (Ball Exh. 100, Death Certificate

for Marlon Washington).  Given that the Government had in its possession long before it chose to charge Mr. Ball with this offense the documents that proved that Kelliebrew's testimony was at best unreliable and at worst a complete fabrication, the Government could not reasonably have expected that jury would (or should) rely on him to convict Mr. Ball of the Lewis homicide.  Yet, the Government would have this Court rely on Kelliebrew's testimony about his dealings with Mr. Ball in support of the position that Mr. Ball should be sentenced based upon the conspiracy that the jury acquitted him of.

The Government's other witness on the Lewis homicide was Bobby Capies.  While his unreliability was not necessarily as obvious as Kelliebrew's, the Government was aware that Capies gave at least three separate versions of the time, place and persons attending Ball's supposed confession of his having shot Lewis.  In addition, the Government knew that for a number of years Capies had been an informant for a detective in the Seventh District and during that time had failed to mention anything about the death of Troy Lewis.  Rather, Capies first disclosed his information to the Government only after Capies himself had been arrested for first degree murder of Devar Chandler, a murder that Capies first tried to pin on other people.  Furthermore, Capies had also informed the Government in one of his initial debriefings, after he was supposedly cooperating and being honest, that a third person, William "Smoke" Truesdale, had confessed to killing Lewis.  Despite the defense having made a *Brady* demand that should have produced the memorandum of this interview long before the beginning of trial, the document was not disclosed to the defense until the night before Mr. Ball's counsel began cross-examination and only after counsel made a specific inquiry whether Capies had ever discussed his alleged knowledge of Lewis's murderer prior to his testifying in the grand jury.

Putting aside the ethical question whether the Government *should* have relied on Capies under these circumstances, the absence of any corroboration for any of Capies's accounts surely should have made the Government ponder whether it was likely to be successful in proving the charge.  But as is now clear, the Government sees no difference between sentencing a person after conviction versus after acquittal:  all it need do is present a series of charges (which in itself increases the likelihood of scoring at least one conviction) and for those charges on which the defendant is acquitted, select the best parts of the direct examination and send it over to the Probation Office who will dutifully read the one-sided account and, in the absence of any contrary evidence, determine that there is a "preponderance of evidence" to support the charge (a self-fulfilling prophecy if there ever were one since only one side of the story is presented), and like clockwork the defendant's offense level has just been increased.

## II. THE TREVON SHAW HOMICIDE.

The paucity of evidence to support the charge that Mr. Ball shot Trevon Shaw is so striking, the reasons to doubt the testimony of the central witness so readily apparent (even before she demonstrated a willingness to lie under oath); and the contradictory evidence so substantial that one must again question the standard the prosecution employed in bringing this charge.  Furthermore, the Government's willingness to argue the testimony of Brittany O'Brien after she the Government knew for certain that she had testified at trial to a description of Mr. Ball's conduct that could never be reconciled with the sworn testimony she gave in the grand jury.  But one need not resort to grand jury testimony to demonstrate Ms. O'Brien's disregard for the truth or the significance of an oath; she admitted on cross-examination that she lied on direct examination regarding her relationship with the decedent.. The Court may recall that one of the theories advanced by one of the other defendants was that Ms. O'Brien's brother was the person

that actually killed Shaw because Shaw, who was approximately five years older than

Ms. O'Brien, who was 14 at the time of Shaw's death, was engaged in a sexual relationship with

Ms. O'Brien.  The Government was surely aware of the nature of the relationship, yet permitted

Ms. O'Brien to lie about it in response to the prosecutor's questions. Only after  she was directly

confronted on this point on cross-examination that she admitted the truth. When asked why the

question made her giggle, she explained that she never thought anyone would ask her so directly

(thus explaining why she thought she could get away with lying when it suited her).

 In addition, Ms. O'Brien materially changed her account of Mr. Ball's conduct in the

immediate aftermath after his allegedly shooting Mr. Shaw.  Thus, in the grand jury, Ms.

O'Brien testified that after shooting Mr. Shaw a second time, Mr. Ball got into his SUV and tried

to leave the parking lot only to be blocked in by her uncle's car.  Yet, at trial, she testified that

after allegedly firing the second shot Mr. Ball proceeded to wander over to a grassy area

immediately next to the body where there was a fence and strolled back and forth for an

extended period of time: according to this new version of events disclosed on direct examination

– meaning that the prosecution knew that she would testify under oath in direct contradiction to

the version she gave in the jury.  Putting aside how the prosecution dealt with the ethical issues,

on what did they base their  belief that they could prove this charge beyond a reasonable doubt

given that Ms. O'Brien was their only eyewitness to Mr. Ball's alleged conduct?

But the prosecution needed to disregard more than Britany O'Brien's willingness to lie

under oath.  Given her testimony that  Mr. Ball was still standing near the body when she

returned to the alley after she had gone into the house and returned with her aunt and mother to

where Mr. Shaw's body was lying; and that Mr. Ball actually spoke to her aunt while she stood

next to Shaw's dead body, one might have supposed the Government would have hesitated

before calling Emanuel Hart as a witness to testify that he saw Mr. Ball emerge from his business office essentially a block away from the location of the shooting  at a point when, according to the account of Ms. O'Brien, Ball was still strolling  in the grassy area next to the body of the man he supposedly killed.  Instead, the Government sent the lead detective out during the last week of trial to create a video intended to show that if Ball began walking from the alley to his office immediately after shooting Shaw, he could have made it within the estimate of time that Hart said elapsed between hearing the shots and then seeing Mr. Ball come from his office.  The problem with this testimony, as the Government well knew, was that Brittany O'Brien had testified under oath that Mr. Ball didn't immediately leave the alley.  Which meant that the premise on which the video was based directly contradicted the Government's only eyewitness .

The Government represented to the Court, in a case in which had initially hoped to get the death penalty, that it was unable to locate the aunt described by Ms. O'Brien as the person Ball spoke with while strolling along the fence next to Shaw's dead body.  Given the seriousness that the Government supposedly attached to this criminal act, we find it difficult to accept that the police were unable to find a witness who would, if Ms. O'Brien were to be believed, corroborate of her testimony, rather than contradict it, as was the case with the testimony elicited from her mother on cross-examination

Again, one must wonder how the Government justified its decision to charge Mr. Ball with this crime.  But assuming that question was not one they contemplated, one must also wonder how they convinced themselves that they could obtain a conviction – assuming that prevailing on this charge made a difference in light of their calculation that they'd likely convict Ball of something; and that merely making the charge and putting on witnesses whose direct

examination could be shown to the Probation Office was enough to get virtually the same Guideline result as if they had been successful.

## III. THE CONSPIRACY COUNTS.

The impact of acquitted and uncharged conduct on Mr. Ball's calculated Guideline level is exhibited most directly in the Probation Office's decision to ignore Mr. Ball's acquittal of the two conspiracy counts charged in the indictment.  Not only does this decision make Mr. Ball responsible for a quantity of crack cocaine 150 times the quantity supported by the jury verdict with respect to Count 22; but acquitted conduct also becomes the foundation upon which the Probation Office bootstraps enhancements for Mr. Ball's supposed managerial role, his supposed use of a weapon, and his commission of a crime while on release -- all of which the Probation Office predicates on his involvement in conspiracies of which he was acquitted.  To endorse sentencing on this logic is to completely wipe out a defendant's constitutional right to a jury trial; all the Prosecution need do is structure a sufficiently broad indictment that includes no more than one count on which they can confidently predict a conviction, present lots of witnesses without regard to their veracity and reliability, and, after the jury has predictably rejected virtually all of its evidence, obtain a sentence based on the crimes that were charged in the indictment without regard to the result at trial.  It is a sentencing scheme straight from the mind of Lewis Carroll.

To support their position on the proper sentence for Mr. Ball, the Government has selected excerpts of testimony that the jury heard and rejected but which the Government now claims the Court can use to impose the same sentence that Mr. Ball would have received had the jury credited that testimony and returned verdicts of guilty.  But as with the homicide witnesses, the Government ought not have been surprised that the jury rejected the testimony of witnesses it presented to support its claim that Antwuan Ball was the head of a racketeering organization.  A

review of the testimony of several of the principal witnesses the Government introduced reveals once again that the Government simply chose to disregard information it had in its possession that should have alerted it to the unreliability of the stories these witnesses were purveying in exchange for lesser sentences.  Two of the witnesses whose testimony was directed almost exclusively at Mr. Ball were Robert Crawford and Steve Marsh, and a review of that testimony demonstrates that once again the Government either ignored or was indifferent to uncontestable facts in its possession long before the trial that showed the witnesses were going to give false testimony.

### A.       **Robert Crawford**

Robert Crawford testified on April 16-17, 2007.  His testimony was a central element in the Government's efforts to show Mr. Ball to be a big time drug dealer; indeed, the Government put into evidence charts prepared by Special Agent Lockhart that showed numerous attempts by Crawford and Ball to reach each other on their respective cell phones (although he was ultimately forced to acknowledge that with respect to most of these "calls" there could be no certainty that they actually even spoke with each other).  In presenting Crawford's direct testimony, the Government essentially ignored the fact that Crawford had testified on a previous occasion in the United States District Court in the District of Maryland regarding his drug dealing partnership with a gentleman by the name John Proctor.  Instead Mr. Crawford discussed his activities in the District of Columbia, most of which, he claimed, involved his relationship with Mr. Ball.  Thus, on direct examination, Crawford claimed that after meeting Ball "in late 1999 or early 2000," they "met almost everyday."  He claimed to have been in Ball's presence shortly after Ball had a confrontation with Bobby Capies and that he sold Mr. Ball substantial quantities of crack cocaine, both directly and through an intermediary known as "Cheese".

Since the Government provided the defense with the transcript of the testimony of

Mr. Crawford in the *Proctor* trial in Maryland, one would suppose that the Government would

actually have read that testimony and discussed it with Mr. Crawford prior to calling him as a

witness.  But apparently they never bothered. The transcript revealed that Mr. Crawford had the

unique capacity to be in two places at once; he had testified in Proctor's trial that in 1998, 1999

and 2000, encompassing the time period when he supposedly "met everyday with Mr. Ball in

Congress Park" that he had spent everyday with Proctor from 9:00 AM until 3:00 AM (18 hours

a day) in Maryland where they together sold drugs, drank, and "chased women".  Tr. April 17,

2007, at 7308-7314).  Crawford was also confronted with two mutually exclusive versions of his

sworn testimony on topics such as where he hid money and whether he had legitimate sources of

income during the years he was selling drugs.  Tr. April 16, 2007, at 7181-7184.  Thus, in the

Maryland trial, Crawford testified colorfully how he hid large quantities of money in various

places in his house. When asked at trial about hiding money in his house, Crawford denied that

he had ever done this until he was confronted with his previous sworn testimony.  Crawford was

also the witness who had difficulty reconciling his testimony in Maryland that he had no

legitimate sources of income during the entire time that he knew Proctor (which overlapped the

time that he knew Ball); with his testimony in Mr. Ball's trial that he had owned several

legitimate businesses, but that he had forgotten about them when he was testifying in Maryland.

When pressed on this point, Crawford said that his recollection had been refreshed by a

conversation with his wife that he had in 2004, which then required him to explain how it was

that this conversation in 2004 caused him to remember in 2007 something that he had not

remembered when he testified in Maryland in 2005.  His inability to accomplish that trick may

have caused the jury to reject his testimony regarding his supposed interactions with Mr. Ball,

none of which was corroborated by the testimony of any other witness.  The Government relies

on his testimony to justify sentencing Mr. Ball on the acquitted conspiracies.

### B.       Steven Marsh

The Government's reliance on portions of the direct testimony of Marsh in its sentencing

memorandum reflects yet another example where the Government presented a witness without

paying any attention to whether the story he was telling could ultimately be true.  Like Crawford,

Marsh was a witness who did not live in Congress Park and who was introduced specifically to

bolster the Government's charge that Mr. Ball was a major drug dealer.  The Court may recall

that Marsh presented himself as a particularly arrogant witness who was sarcastic in his

responses to the prosecutor's questions and even more so to those from Mr. Ball's counsel.  And,

like Crawford, he was caught in a major lie that the prosecution could not smooth over, though

not for lack of effort.  Specifically, Marsh testified that he met Mr. Ball in 1999, when Marsh

came to Congress Park to stay with a friend because, in Marsh's words, he was "running from

the U.S. Marshals because I had an ongoing indictment in Virginia."  Tr. April 30, 2007, at 9164,

9167.  He repeated this testimony additional times on cross-examination. He claimed to have

spent substantial time with Mr. Ball over the ensuing several years; indeed, he claimed that

during this several year period, he had given Mr. Ball an Uzi as a present.

It was curious that Marsh chose to specifically identify the U.S. Marshals as the law

enforcement agency that he was running from in 1999, because that agency would not typically

be involved in routine law enforcement activities, as compared to the Metropolitan Police

Department or the Federal Bureau of Investigation. Rather the Marshals would indeed typically

not become involved until there were federal charges pending and the Court had tasked them

with finding the fugitive.  Whether or not Marsh actually had "an ongoing indictment in

Virginia" in 1999 was information readily available to the Prosecution; apparently, however, the

Prosecution did not bother to confirm the truthfulness of the testimony that they surely knew

Marsh was going to give.  But on cross-examination, it was disclosed that Marsh did not have

"an ongoing indictment in 1999" and, therefore, he could not have been "running from the U.S.

Marshals" because there was no reason for the Marshals to be looking for him in 1999.  Indeed

Marsh was not indicted until March 29, 2001, and was arrested a mere 45 days later.  (Ball Exh.

69, Marsh Indictment; Tr. May 1, 2007, at 9320.)  Again, the documents that were used to

impeach Marsh were provided to the defense by the Government; evidently the Government did

not bother to look at them or, if it did, did not trouble itself with the blatant inconsistency

between the Court records and Marsh's testimony.  But the disclosure of that inconsistency

certainly could account for the jury's refusal to credit it and convict Mr. Ball of the conspiracy

that Marsh's testimony was intended to prove.

    Crawford and Marsh are merely two examples of a phenomenon that was played out with

respect to many of the witnesses that the Government presented over many months.  The jury

heard those witnesses and refused to credit the testimony they gave.  Yet, the Government's

citation of selected portions of their testimony, and the Probation Office's reliance on the

prosecution's selections in calculating Mr. Ball's Guidelines, places the Defendant in the curious

position of having to justify why Court ought not sentence him on testimony that a jury decided

not to credit.  That the jury made that choice ought to be the end of the inquiry, just as it is when

a defendant is convicted and attempts to attack the verdict by pointing out all the reasons that a

jury should not have accepted the testimony of Government witnesses.  Indeed, such attacks on a

jury verdict by a defendant are routinely dismissed summarily; Mr. Ball submits that the Court's

response to the Government's attempt to reverse the outcome of this jury trial should be subject to the same rule.

## TREATMENT OF ACQUITTED CONTACT POST-BOOKER

One would be hard-pressed to come up with a better example than this case for showing the injustice that can be accomplished through the use of acquitted conduct to fashion a criminal sentence. If Mr. Ball were sentenced solely on the one offense for which he was found guilty, his Guideline level would be 24 and, depending upon his criminal history category, his sentencing range would be between 51 and 71 months. If the Court were to sentence him to the five-year mandatory minimum, he would be released in several months.

By relying on acquitted conduct, however, the drug quantity for which Mr. Ball is held responsible increases 150 times, from 11 grams to 1.5 kilograms. That increase by itself places him in a range between 188 months (Category I minimum) to 293 months (Category III maximum). On top of that, the Probation Office has chosen to apply other enhancements that would no longer be applicable if one excludes acquitted conduct from the calculus. Thus, if the Court were to adopt the Probation Office's Guideline calculation and follow the Government's sentencing recommendation, the outcome of this trial would be no different than had Mr. Ball been convicted. The Government was given a full opportunity to prove the charges that it brought against Mr. Ball; it failed utterly. Accordingly, the Court should reject the Government's effort, endorsed by the Probation Office, to have the Court impose a sentence based upon the charges that were brought rather than those that were proven.

In *Gall v. United States*, 128 S. Ct. 586 (2007), the Supreme Court laid out the procedures to be taken by a federal district court in determining a proper sentence in light of the decision in *United States v. Booker*, 543 U.S. 220 (2005).

- 14 -

1.      "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency the Guidelines should be the starting point and the initial bench mark. The Guidelines are not the only consideration, however."  Id. at 596.[1]

2.      "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the District Judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party.  In so doing, [the Judge] *may not presume that the Guidelines' range is reasonable.*  [The Judge] must make an individualized assessment based on the facts presented."  *Id.* at 596-597 (emphasis added).

3.      "If [the Judge] decides that an outside-Guideline sentence is warranted, the Judge must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Id.* at 597.

4.      After settling on the appropriate sentence, [the Judge] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."  *Id.*

The Supreme Court in *Gall* also set out the procedures to be followed by the Court of Appeals in reviewing a sentence post-*Booker.*  In summary form, sentences, whether inside or outside the Guidelines, are to be reviewed under an "abuse of discretion" standard.  The Circuit Court may not presume the unreasonableness of a sentence outside the calculated Guideline

---

[1] In a companion case to *Gall*, the Supreme Court in *Kimbrough v. United States*, 128 S. Ct. 558 (2007), held that while a district court must "include the Guidelines range in the array of factors warranting consideration" and "give respectful consideration to the Guidelines," the Court "may vary [from Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines," *e.g.*, the 100-1 disparity between the crack and cocaine Guidelines. *Id.* at 564, 570 (alteration in original) (quotation marks omitted).  Thus, the Court is not bound to follow the Guidelines treatment of acquitted conduct if the Court disagrees with the underlying policy considerations or its application in this case.

range and may not substitute its judgment for that of the trial court in applying the § 3553(a)

factors in an individual case.  *Id.* at 597.

The Defense has noted its objections to the calculation of the Defendant's base offense

level using "relevant conduct."  The Defense has also registered its objections to the use of

enhancements that are justified by the Probation Office solely on the basis of the so-called

"relevant conduct."  In addition, the Defense objects to the application of an enhancement based

upon obstruction of justice arising out of the claimed intimidation by Mr. Ball of Mr. Capies, an

allegation that, as the Court noted at the time, was never substantiated.  Thus, it is the position of

the Defense that the proper Guideline level for Mr. Ball is Level 24.

As the Court is no doubt aware, since the Supreme Court's decisions in *Gall* and

*Kimbrough*, the propriety of using acquitted conduct in establishing Federal Guideline Offense

Levels has emerged as a key sentencing issue.  Indeed, Justice Scalia's concurring opinion in

*Gal*l invites Defendants to bring as-applied challenges:

> The door … remains open for a defendant to demonstrate that his
> sentence, whether inside or outside the advisory Guidelines range,
> would not have been upheld but for the existence of a fact found
> by the sentencing judge and not by the jury.  128 S. Ct. at 602-603
> (Scalia, J., concurring).  (Emphasis added.)

Justice Scalia's admonition flows from the Court's decisions in *Apprendi v. New Jersey*,

530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004).  In *Apprendi*, the Supreme

Court held that a defendant's right to a jury trial under the Sixth Amendment mandated that

"[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond

the prescribed statutory minimum must be submitted to a jury, and proved beyond a reasonable

doubt."  *Id.* at 490.  Thereafter, in *Blakely*, the Court made clear that "the relevant statutory

maximum" is not the maximum sentence a judge may impose after finding additional facts, but

"the maximum [the Judge] may impose without any additional findings."  *Id.*  In other words, the

term "statutory maximum" in *Apprendi* did not mean the maximum sentence in a statute, but rather the top end of a Guideline range in a mandatory guideline sentence.  This, of course, led directly to the result in *Booker* that resulted in the transformation of the mandatory guidelines into the advisory guidelines.  More recently, the Supreme Court flatly stated that "if the jury's verdict alone does not authorize the sentence … the Sixth Amendment requirement is not satisfied."  *Cunningham v. California*, 127 S. Ct. 856, 869 (2007).  In holding that *Blakely* was applicable to California's determinate sentencing law, the majority (six justices) remarked "Booker's remedy for the Federal Guidelines … is not a recipe for rendering our Sixth Amendment case law toothless."  *Id.* at 870.  (Citation omitted.)  *See generally, James J. Bilsborrow*, sentencing acquitted conduct to the post-Booker dust bin, 49 Wm. & Mary L. Rev. 289 (2007).

The Supreme Court's decisions in *Gall*, *Kimbrough*, and *Cunningham* suggests that the Court may be prepared to revisit its decision in *United States v. Watts*, 519 U.S. 148 (1997) (*per curiam*) in which the Court held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."  *Id.* at 157.  Although a number of judges around the country and in this Court have questioned the continued vitality of the *Watts* decision, the Defense acknowledges that the Circuit Court's decision in *United States v. Dorcely*, 454 F.3d 366 (D.C. Cir.) *cert. denied* 166 L. Ed.2[nd] 518 (2006), concluded that because the Supreme Court in *Booker* did not expressly overturn *Watts*, the use of acquitted conduct in sentencing does not violate either the Sixth Amendment right to a jury trial or the Fifth Amendment right to due process.  *Id.* at 372.  *Dorcely* also held that under *Booker*, facts encompassed in acquitted

conduct may be established by a preponderance of evidence.  *Id.  Accord. United States v. Brown*, 2008 U.S. App. LEXIS 4380 (D.C. Cir., Feb. 29, 2008).

     *Dorcely* does not, however, command the District Court to use acquitted conduct.  In *United States v. Safavian*, 461 F. Supp.2d 76 (D.D.C. 2006), Judge Friedman declined to incorporate acquitted conduct in determining the sentence.  In *Safavian*, the defendant was convicted by the jury of three counts of false statements and one count of obstruction of a GSA-OIG investigation.  He was acquitted of one count of obstructing a Senate Committee investigation.  At sentencing, the Government argued that under *Dorcely*, Judge Friedman should find by a preponderance of the evidence that the defendant obstructed the Senate Committee investigation as charged in the count in which he was acquitted and include that count in determining the defendant's total offense level.  Judge Friedman rejected the government's request and stated as follows:

> The holding in *Dorcely*, …, does not mandate consideration of acquitted conduct under the Guidelines, stating only that "we believe [*Booker's*] language is broad enough to allow consideration of acquitted conduct as long as the Court "deems [it] relevant."  (Citation omitted.)  The Opinion goes on to cite the language in *United States v. Watts* that takes a similarly permissive view of whether a judge may consider acquitted conduct.  *United States v. Dorcley*, 454 F.3d at 372 ("A jury's verdict of acquittal *does not prevent* the sentencing court from considering conduct underlying the acquitted charge so long as that conduct has been proved by a preponderance of the evidence.")  (*Quoting, United States v. Watts*, 519 U.S. at 157 (internal punctuation omitted) (emphasis added).  This Court declines to exercise its discretion under the advisory guidelines to consider such conduct *because [the Court] has long believed that consideration of acquitted conduct "trivializes 'legal guilt' or 'legal innocence' which is what a jury decides."  United States v. Pimenthal,* 367 F. Supp.2d 143, 152 (D. Mass. 2005).

461 F. Supp.2d at 83 (emphasis added).

*Pimenthal* is perhaps the seminal opinion addressing this issue, authored by United States

District Judge Gertner, who has written and lectured extensively on the acquitted conduct issue.

In *Pimenthal,* Judge Gertner examines and analyzes the interplay of the Fifth and Sixth

Amendments and *Booker* and concludes that reliance on acquitted conduct under a

preponderance of the evidence standard to establish a Guideline level is inconsistent with the

Sixth Amendment.  In summing up her analysis, she stated:

> It makes absolutely no sense to conclude that the *Sixth Amendment*
> is violated whenever facts essential to sentencing have been
> determined by a judge rather than a jury, and *also* conclude that the
> fruits of the jury's efforts can be ignored with impunity by the
> judge at sentencing.  367 F. Supp.2d at 150.  (Emphasis in
> original.)

More recently, Judge Fletcher of the 9th Circuit, dissenting from a decision permitting the

use of acquitted conduct, offered the following observations which we submit are particularly

appropriate in light of the Prosecution's evidence in this case and the jury's treatment of it:

> By allowing judges to consider conduct rejected by the jury, the
> Court allows the jury role to be circumvented by the Prosecutor
> and usurped by the Judge – two of the primary entities against
> whom the jury is supposed to protect the defendant.  *See Duncan v.*
> *Louisiana*, 391 U.S. 145, 156 (1968) ("providing an accused with
> the right to be tried by a jury of his peers gave him an inestimable
> safeguard against the correct or over zealous prosecutor and
> against the compliant-biased or eccentric judge").  The jury simply
> cannot protect a defendant against the over-zealous prosecutor or
> the compliant-biased or eccentric judge if those same individuals
> have the authority to ignore the jury's verdict.  To reiterate, the
> consideration of acquitted conduct severs the connection between
> verdict and sentence.

United States v. Mercado, 474 F.3d 654, 662-665 (9th Cir. 2007), *cert. denied*, 2008 U.S. LEXIS

2935 (U.S., Mar. 31, 2008) (Fletcher, dissent).

As we have tried to show in our discussion of the evidence presented by the Government,

this case exemplifies the concerns that Judge Fletcher focused on.  A sentence that is based upon

the combine efforts of the prosecution and the Probation Office to lock up Mr. Ball for life

means, effectively, that he will serve that sentence based upon the Government's decision to

charge him with crimes that it knew or should have known could not be proved.

Accordingly, we ask the Court to reject the use of acquitted conduct in  the calculation of

Mr. Ball's offense level and to find that the proper offense level is 24.

Defendant will supplement this pleading with his discussion of the application of factors

under 18 U.S.C. § 3553(a).

Respectfully submitted,

        /s/
Steven C. Tabackman (DC Bar # 934539)
TIGHE PATTON ARMSTRONG TEASDALE, PLLC
1747 Pennsylvania Avenue NW
Suite 300
Washington DC 20006
(202) 454-2811
(202) 454-2805 (fax)

        /s/
John 1. Carney (DC Bar # 241745)
South Building
601 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 434-8234
(703) 323-9760 (fax)